UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | () | CRIMINAL ACTION |
| | () | NO. H-11-45 |
| VS. | () | HOUSTON, TEXAS |
| | () | AUGUST 31, 2011 |
| JAMES PETERS | () | 8:51 A.M. |

EXCERPT OF JURY TRIAL
BEFORE THE HONORABLE SIM LAKE

GOVERNMENT'S CLOSING ARGUMENT AND REBUTTAL

APPEARANCES:

FOR THE GOVERNMENT: Mr. Joe Magliolo
Mr. Ruben Perez
Assistant United States Attorneys
1000 Louisiana, Suite 2300
Houston, Texas 77002

FOR THE DEFENDANT: Mr. Thomas S. Berg
Mr. Gus Saper
Mallett Saper Berg
600 Travis, Suite 1900
Houston, Texas 77002

COURT REPORTER: Anita G. Manley
Official Court Reporter
515 Rusk, 8th Floor
Houston, Texas 77002

Proceedings recorded by stenographic means, transcript produced by computer.

P R O C E E D I N G S

MR. PEREZ: May it please the Court, counsel for the defense.

Good morning, ladies and gentlemen. On behalf of the people involved in this case, I want to thank you for your time and patience in listening to this case. It has been a very short case, but the issues here obviously are very, very important.

I want you to remember that, as the Judge said in the Court's instructions, to please use your common sense. When you were selected as jurors, you didn't leave your common sense at the doorway. I remind you that you took an oath to render a verdict based on the law and the evidence presented, all the legally admissible evidence that was presented to you.

As I told you in opening statement, this defendant is charged with four counts of making a false statement to the Office of Inspector General knowing that the statement was false. Based on the legally admissible evidence brought before you, this defendant is guilty of all four counts.

I'm going to briefly go over the Charge with you. As the Judge said, the defendant is presumed to be innocent. That doesn't mean that he is innocent. That means there's a presumption that he's innocent. If you find him guilty, the defendant is guilty when he committed the crime, he's guilty as

he sits there. That presumption vanishes. It doesn't mean that he's guilty, just the presumption that he is not guilty.

As I told you -- as we told you when we were selecting you as jurors, we don't have to prove this case beyond all doubt. I told you that in opening statement as well. The Judge instructed you in the jury instructions we don't have to prove our case beyond all doubt, not beyond an absolute doubt, not as Perry Mason would say it -- those who remember that -- not beyond a shadow of a doubt. Just beyond a reasonable doubt.

The Judge also instructed you that neither are you concerned with the guilt of any person or persons not on trial. And that's basically, in a nutshell, the jury charge, four counts of lying to officers of the Inspector General, knowing that those statements were false.

If I say something to you that didn't come -- I didn't state it correctly, please disregard what I have to say or what the defense has to say because twelve pairs of ears are better than one pair.

Okay. What are the facts that were brought here before you? We know that on December 14, 2005, there was a drowning there on the Rio Grande. We know that somebody reported it to the Mexican government, that there had been a drowning caused by a helicopter, and that the Mexican government called the American government. The American

government says, "Well, we'll check into it. Mr. Jenkins is going to check into it."

Mr. Jenkins then calls Wally Trujillo. He says, "I'll check into it." Mr. Trujillo then checks with his pilot. "No, there was no activity. There was no traffic there downtown."

Now, we can play his words -- they can play with words all they want. They can be nitpicky. But everybody knew Mr. Trujillo, when he asked him downtown, "Did you have any encounters there downtown at the port of entry, any of the bridges?" "No. Didn't work any traffic. Didn't work any traffic." H'm.

Calls Mr. Jenkins and says, "No, we didn't have any encounter with any aliens. There was no traffic. We don't know what the Mexicans are talking about." Okay.

Lo and behold, a body surfaces. Oh, shucks. And at that point, Mr. -- an Office of Inspector General investigation is initiated to check to see what had happened. So Mr. Ortiz starts conducting the investigation.

And what did he tell you? He says, "We were going to close the case. We were going to close it but for the video." Thank God he found that video.

So at that point, when the meeting is called to interview Mr. Peters, what does the evidence clearly show you? Try to summarize it. The evidence clearly shows that Mr.

Peters, when he went to the meeting on December 14, 2005, he knew that he had some interactions with the aliens at Port of Entry No. 2. The evidence clearly shows, even by his own testimony, he had had interaction with the aliens at Port of Entry No. 2. He knew that when he went to the meeting.

He also knew, based on the evidence that you heard here today, that somebody had said there had been a drowning at that area, Port of Entry No. 2. The evidence clearly showed that he knew that because it was common knowledge that a body had been found. And he also knew that an investigation was ongoing when he got called. So the evidence clearly shows that.

Now, he wants you to believe that when he looked at his pilot log, he said, "Well, I did fly," but he distances himself from Port of Entry No. 2. What a coincidence that he has interaction at Port of Entry No. 2. He doesn't remember that. But he does remember that 18 miles away, he had had interactions with some other aliens and even reports that in his pilot log. "But, no, I had nothing to do with that area. Just like an ordinary day."

The evidence clearly shows that. What he did not know, based on the evidence, is that Mr. Peyton Patterson, the Border Patrol agent on the ground, thought that the aliens had made it safely across to the Mexican side. He did not know that. He did -- he had not had any conversation with Mr.

Patterson, and the agents testified they hadn't even interviewed Mr. Patterson until after January 25, 2006, when he had contact -- when he was interviewed, when Mr. Peters was interviewed.

And what really is important is that Mr. Peters did not know they had a video camera on Port of Entry No. 2. He did not know that. So he's going to admit that he was flying that day, but he's not going to have to admit anything about a Port of Entry No. 2, any contact with those aliens. Knows that there's a drowning, but he's going to admit that he was 18 miles away. That, the evidence clearly shows that.

What we don't know is whether he actually knew that the inner tube had flipped over. There's no evidence either way on that. We don't know that.

Regardless, he goes to the meeting. He's interviewed, says, "Well, I didn't know that I had flown that day, but looking at my log, I did fly. I did fly that day." But, again, he's trying to distance himself way away from Port of Entry No. 2. "I had contact with them 18 miles away but nothing with Port of Entry No. 2."

Now, when he testified, it defies logic and it's really insulting to listen to him, to play games with these words. When he was interviewed -- and look at Government Exhibit No. 25, his statement, which is recorded by the agents. This is the gist of what -- the heart of what this case is all

about. Had he encountered any aliens that day? And they play games with you. Well, was it a turn-back? Was it an alien? Was it an immigrant? Did he encounter somebody there at Port of Entry No. 2? "Well, no, but I encountered somebody way away from there."

Count No. 2: Did you fly at the bridge level or below the bridge level? "Well, I actually thought they meant had I flown under the bridge." That defies logic. That's insulting for him to think that you're going to believe that he was asking to explain "under the bridge." One does not have to be a pilot to know that you don't fly under a bridge.

He had never flown or hovered at low altitude. "Well, since they're not pilots, they actually hover; but, you know, that's a different definition of what my definition is." Mr. Magliolo asked him, "Well, how about low altitude?" "Well, since they're not pilots, their definition of low is different from my definition of low."

If you look at the indictment and you look at his statement in Government Exhibit No. 25, not only was he asked whether he hovered over the low altitude, he was also asked whether he had flown in low altitude that day. Not just hovered, he was also asked whether he had flown. So, again, getting -- trying to confuse.

And, ladies and gentlemen of the jury, this case is not very long. It's not very difficult. Don't be led on

any rabbit trails. Don't let these smokescreens confuse you. Just listen to the evidence, please. And, clearly, he's trying to confuse you in saying, "Well, you know, low altitude means something else. Hovering means something else."

Had he flown low enough to move cane but never in close proximity? "Well, when I say close proximity, that meant something to them, but it really meant something to me. Close proximity, that really -- it really doesn't mean what it says it means."

Then even when the defense talks about it, they even established as he had -- that the helicopter was 100 feet from the bridge. A hundred feet is from here to that door, not far. It is not far. Close. That's close proximity.

Mr. Gethon Robinson, who testified here today, insulting. He tells you, "Well, to me, getting close to the bridge in the helicopter means being two or three feet away. That's what it means to me." Can you imagine getting that close to the bridge, two or three feet away from the bridge? That can be very dangerous. Close proximity. You don't have to be a pilot. You don't have to be trained in that area to know that close proximity means close to Bridge No. 2.

But for that video, as Mr. Ortiz told you, they were going to close the case. This case was going to be closed. But, luckily, the camera had panned into that area. By the way, when you get back to the jury room, you can request

the tape because it's in evidence. I'm not going to show it to you because you can see it if you want to. But the tape is very, very self-explanatory. You can see the low bridge level. Not underneath the bridge -- of course not -- but below bridge level.

As a law enforcement officer, when he was interviewed, as a person who has taken an oath just like you have, somebody that's taken an oath to uphold the laws of the United States of America, held to a very high standard as far as telling the truth. Mr. Trujillo is no longer with the Office of Inspector General. Mr. Ortiz is no longer with the Office of Inspector General. Because they're law enforcement agents, we have a duty to expect these agents to follow their oath.

When he was interviewed on December -- on January 25, 2006 -- again, he's playing games with you. He says, "Well" -- Mr. Magliolo asked him questions. He said, "Well, they didn't ask me that question. They didn't ask me that question." "How about this?" "Well, they didn't ask me that. And when they asked me close proximity, I really didn't know what they meant by that."

As a law enforcement officer, when he was questioned, he should have been eager to assist in the investigation. Tell them the truth. Tell them the truth. But the reason he did not tell the truth on January 25, 2006, is

because he did not think that anybody was going to be able to prove that he was there by Port of Entry No. 2. Did not know there was a tape.

As a law enforcement officer, when he took that oath to follow the law, protect us, we expect those officers to be honest, to protect us, to tell the truth. It's against the law to lie to a federal agent in the course of an investigation. Very simple. He did not tell truth that day, January 25, 2006. It's clear from the evidence he did not.

Based on the evidence and the law presented to you, this defendant is guilty of all four counts of not telling the truth to the agents. Thank you.

*

*

*

MR. MAGLIOLO: Thank you, Your Honor.

So, what happened? What caused Mr. Peters, who otherwise appears to be a pretty decent human being, pretty decent guy, to lie to the investigators? That's the key to this case, and you've got to look at that. You've got to wonder what happened? What caused an otherwise decent person to lie about this case?

Let's look at it. I think we all can agree that Mr. Peters was flying a helicopter that day, working the river, looking for business. He had already worked, uncontroverted,

something down the river, involved four turn-backs. It's in his log.

He spotted two people in the river. You remember the -- Patterson on the ground said, "Hey, we got a call from the pilot saying he had spotted two folks in the river." And then Patterson returned, said, "Hey, don't worry about it. These guys aren't doing anything." As Patterson told you, they can tell. They've been out there all the time. They know when people are trying to smuggle someone in, when they're trying to get in. These guys are out there just giving the agents grief, something they do all the time, yelling at them, hollering at them, just giving them grief.

So he tells the pilot, "Hey, don't worry about these guys. They're not doing anything." Well, Mr. Peters decides to go on and try to push them back, turn them back, force them back. And remember he says that to Patterson on the radio, "I'm going to go on and push them back." You view the video. And you saw it, but I'm guessing you'll probably want to see it again. There's equipment that will be provided to you to be able to watch the video in the jury room.

You see what the helicopter does. And it seems to, from the evidence, from the tape, progressively take more aggressive action toward the folks in the water. And that's reasonable based on the evidence. Because, remember, these folks weren't somebody just trying to smuggle someone at that

time. Though, there's no question that at least the spiky-haired guy was the smuggler.

But the evidence from Patterson was these guys are just there giving the Border Patrol guys grief, you know, busman's holiday. They're not smuggling anybody that particular time, but they're just giving them hell, as much hell as they can. So Patterson -- I mean -- I'm sorry -- Peters is trying to push somebody back that he probably reasonably believes may be smuggling. Well, these guys aren't going back. They're just there to give everybody grief.

So, it forces Patterson (sic) -- and watch the video -- to be aggressive, more aggressive. You look at it. You can see at some point in time he's right on top of them. Now, whether the tube flipped over or didn't flip or what happened at that point, it's really hard to tell. I ask you to look at it, and I believe you will see that at some point when -- right after Peterson (sic) is right on top of them, you see that little black object, which reasonably is a tube, scoot away at a high rate of speed or a more high rate of speed than it was at. Reasonable inference from the evidence that it might have moved like that because someone was off the tube.

Now, remember Patterson said they didn't have a good view of the guys in the water because of all the cane that was up there at that time. Patterson also tells you, after Peters leaves, he sees what he believes are those two guys

going on to the far side, make it at least close to the Mexican side safely. But Peters doesn't know that. There's no evidence that Peters knows that the guys that he was pushing, that apparently didn't want to be pushed, made it to the other side.

Peters goes on about his business, goes on down the road. Several hours later, Mexican Consulate complains that one of the Border Patrol helicopters has caused the death of an alien in the river, calls his Border Patrol contact. The Border Patrol contact, what does he do? He calls the head of Air Operations. What is it, logic, that the head of Air Operations is going to do, is check with his guys. "Hey, guys, look. There's a complaint that we caused some alien's death in the river over there by the Bridge No. 2. Anybody know anything about that? Anybody work in traffic downtown, work traffic in that area?" He tells you, "Hey, no one -- everybody said no." Mr. Peters said no, which was logical.

Now, for the first time Peters knows that, "Hey, wait a minute. I pushed those guys petty hard there in the water. I was the only Border Patrol helicopter there. Maybe, or maybe it didn't flip over, and now somebody is saying I killed somebody. I wasn't there." He didn't know about any video.

Trujillo reports that to the folks that made the inquiry. They, in turn, tell the Mexican Government.

Everything is kind of back to normal. Body pops up. Uh-oh. Now the inquiry starts.

Again, and I agree with Mr. Berg, you've got to look at what Peters does. What does he know? Well, he knows that Patterson has not jumped out and said, "Wait a minute. I was there. I saw something." There's nothing about that. Remember, Patterson did not -- did not come into play until later in the investigation. In fact, Patterson wasn't talked to until after Peters' statement. So, no one is saying anything. Border Patrol has circled the wagons, "Not us, not us, not us." Case is almost closed.

Ortiz -- and he's certainly got his problems -- but remember the testimony. His problems were years after this, nothing to do with this case. He's digging around, digging around, saying, "Man, I wonder. There's cameras on the river. I wonder if maybe they caught something." As luck would have it, the camera happened to be pointed at that bridge at that time. That was just luck. Good luck or back luck, depending on where you sit, but it was luck.

They found the video. They checked the records. They figured -- they checked the GPS or the location, and undeniably Peters had the contact with the alien at this spot where the complainant alleges an alien was killed. What do they do? They call him in for an investigation. They call him in and say, "Let's get his side of the story."

What is his side of the story based on what he knows at the time? What he knows is, again, reasonable, the evidence is that he knows what he did, but he knows there's really no witnesses. At worst, it's his word against someone else's. He knows someone has drowned, clear now, body. He knows someone has accused the helicopter pilot, which he knows is him, of causing that death.

So what does he do when he goes to the meeting? "It wasn't me." It's a month later. Patterson's testimony hadn't come up yet. Nothing's come up yet. Border Patrol is happy to know -- for its folk to say, "It ain't us. We had nothing to do with this illegal alien's death. Somebody else, something else. Spiky hair is lying, something. Not us." Circle the wagons.

He says, and it's clear from all three investigators, "I wasn't there." He had his log. He checked his log. "I wasn't there." Now, if you believe Mr. Peterson, they're all mistaken about that. What he really says was, "I don't remember." Remember that was somewhat of a, you know -- somewhat of an unusual day. They had to check ride that day. He had the four push-backs that day. That was the day it first came out that, perhaps, a Border Patrol helicopter had been involved with a death on the river. So, that wasn't just like every other day.

But, again, Peterson said, "I told them I didn't

remember," and, for some reason, all these investigators are sure he said, "I wasn't there." Ortiz writes in his report specifics of what Peterson tells him.

Okay. After they go through the specifics -- and it kind of would be an investigator thing, "Okay. You weren't there. How about this? Did you encounter aliens close to the bridge?" "No, I didn't." "Did you fly close enough to the cane to blow it -- blow the cane close to the bridge?" "No, I didn't." "Did you fly at or below bridge level?" "No, I didn't."

Well, what are they asking him? They're asking him questions about what they saw in the video, specific questions to give him every opportunity to say what he did. "No, no, no." Which now he tells you -- and if you believe this, folks, I guess -- if you believe it, you should find him not guilty. If you believe that when they asked him, "Did you encounter aliens close to the bridge," he said no, not because he was lying, because he's afraid he might have been involved in some death, but because he thought he was 5 foot away -- wasn't 5 foot away and that was close and 100 foot away wasn't close. If you believe that, if that's reasonable, if that's something a reasonable person would do, if that causes reasonable doubt, then you should find him not guilty.

If you believe he asked him if he was flying under a bridge, which common -- you don't have to be a pilot to

know that's probably pretty crazy. If they asked him if he was flying, as reflected in the report, at or below bridge level, if you believe he's telling the truth when he says, "I thought they were asking me if I was flying under the bridge," if that causes a reasonable doubt for you, find him not guilty.

But you have to believe those things, folks. You have to believe that when they asked him if he flew over or hovered over aliens in the water, he said no, not because he was lying, but because, "Well, I really wasn't in a full hover because hover means I'm -- you have to be stationary and the helicopter is moving again. So that's why I said no, not because I'm lying." If you believe that creates a reasonable doubt, folks, find him not guilty. But I submit to you that's completely unreasonable, completely illogical, and completely unbelievable.

Okay. Go back to what Peters is thinking. He denies everything because he knows or he believes at that time there's nothing connecting him to the death. Then he sees the video. Uh-oh. Turns pale, turns white, watches it numerous times. His fat is in the fire now. What does he do? What do the agents permit to do? "If you really -- if all these things you told us is really true, make a statement to that effect." No way.

Mr. Berg keeps talking about this union rep. The union rep hears -- clear from the evidence, hears what Peters

has to say, sees the video. And what does he say? "Uh-oh. You better shut up. We better get out of here."

MR. BERG: Your Honor, there's no evidence from the union rep. He didn't testify to the jury.

THE COURT: The jury will recall what the evidence was.

MR. MAGLIOLO: You recall Mr. Berg talking about the union rep and what the union rep did. You recall that.

That's pretty much it. At the time of the interview, Mr. Peters' interview, at the time he lies, he does not know that Patterson believes that the folks he interdicted made it back. It's reasonable to believe from the evidence that everything Peters knows is consistent with the folks that he had -- or at least one of the folks that he had interaction with there on December 14th, 2005, that one of those folks didn't make it out of the water. He believed no one knew anything about it, no one could prove it-prove it, and the easy thing to do was to just say he wasn't there. And that's what he did. That was a lie. That's against the law, and you as the ladies and gentlemen of the jury have to deal with that.

I talked to you on voir dire about it, but -- the defendant does not have to testify, but if he does, you have to treat that just like any other witness. You have to listen to what he says, how he says it, and make a determination, just like any other witness, whether he's truthful or not. You saw

him testify. You guys have all been around. You make the decision whether or not he was truthful or not truthful in his testimony.

You have a tough job. It's kind of like the manager of a company who has an employee who's a good guy, who has a wife and kids, but doesn't do his work. That manager has to fire the employee. It's no fun, nothing to be proud of, nothing to take any joy in. You, as jurors, have sworn an oath to a true verdict render. I don't expect you to have fun with it. I don't expect you to be joyous in it. This prosecution has not been a joyous prosecution, but you've sworn an oath to a true verdict render.

In your heart of hearts, based on the evidence, you know whether or not Mr. Peters was truthful to the agents and truthful to you. Based on the evidence, Mr. Peters should be found by you guilty of all four counts. Thank you.

(Conclusion of excerpt)

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, TO THE BEST OF MY ABILITY.

________________________ 3/18/14

ANITA G. MANLEY
OFFICIAL COURT REPORTER